Filed 2/3/16  P. v. Snell CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256698 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA126746) |
| v. | |
| DARNELL SNELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur M. Lew, Judge.  Affirmed as modified.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Michael C. Keller and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Darnell Snell appeals a judgment from a jury trial at which he was convicted of second degree murder. He contends the evidence is insufficient to support his conviction, and that the trial court erred in making three evidentiary rulings. Further, he contends his 40-years-to-life sentence violates constitutional juvenile sentencing rules established by the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, 75 (*Graham*), *Miller v. Alabama* (2012) ___ U.S. ___ , 132 S.Ct. 2455 (*Miller*) and related cases, including *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*) and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). We affirm the judgment.

**PROCEDURAL BACKGROUND**

The People filed an information jointly charging Snell, Cordell Hawkins and Marlon Williams, with murder. (Pen. Code, § 187, subd. (a).)[1] It further alleged that the murder was committed to benefit a criminal street gang. (§ 186.22, subd. (b).) The information alleged that Williams personally used a firearm and that a principal used and discharged a firearm which caused great bodily injury and death. (§ 12022.53, subds. (b), (c), (d), & (e).)

The charges against Williams were tried to jury in a separate trial.[2] Hawkins and Snell were tried together, with separate juries. The evidence at the Snell and Hawkins trial showed that the murder was committed when two assailants got out of a car, shot, and were then driven away in the awaiting car. Snell's jury convicted him of second degree murder based on an aiding and abetting theory. Specifically, that Hawkins drove the three defendants into rival gang territory, Snell and Williams got out of the car together and walked up to a group of people, including the victim, and Williams began shooting. Snell may have tried to shoot as well, but failed to pull a gun out of his

---

[1] All further undesignated section references are to the Penal Code unless otherwise specified.

[2] Williams's jury convicted him of second degree murder and found the personal firearm use allegations true, but the gang benefit allegation not true. Williams filed an appeal. Last year, a panel of our court affirmed the judgment against Williams. (*People v. Williams* (Oct. 6, 2015, B258741) [nonpub. opn.].)

2

waistband.  After the shooting, Snell and Williams ran back to the car and Hawkins drove them away from the scene.  Snell's jury found the gang benefit and principal use firearm allegations true.[3]

## FACTS

Snell, Williams and Hawkins were members of the Bounty Hunter Bloods gang. The Bounty Hunter Bloods gang and the Grape Street Crips gang were warring rivals. Members of the Bounty Hunter Bloods commonly referred to members of the Grape Street Crips as "crabs."  According to statements made by Snell while in a jail cell after he was arrested, he and some of his "homeys" were involved in an altercation of some kind with a "crab" on November 6, 2012.  After the altercation, Snell told the others: "Come on now.  Like, we going to get the n-----, but not right now."

On November 6, 2012, at about 7:00 p.m., Hawkins drove Snell and Williams into territory claimed by the Grape Street Crips.  Hawkins drove past a group of about 8 to 10 people, and then parked the car on a nearby street.  Snell and Williams got out of the car. They were wearing black hoodie sweatshirts, with the hoods pulled up over their heads. Snell and Williams walked back toward the group they had driven past.  Williams said, "Where y'all from?" and then immediately began shooting.  At the same time, Snell appeared to be "tugging at his waistband," but he did not fire a shot.  When Williams began firing, the crowd scattered.[4]

---

[3]     Hawkins's jury convicted him of first degree murder based on an aiding and abetting theory —— that he drove Snell, and Williams, the shooter, to and from the scene of the shooting.  Hawkins's jury likewise found the gang benefit and  firearm allegations true.  Hawkins filed an appeal.  Last year, a panel of our court affirmed the judgment against Hawkins.  (*People v. Hawkins* (June 8, 2015, B254416) [nonpub. opn.].)

[4]     The shooting was witnessed by Robert McCovery and Anthony Craig, both of whom testified at trial and described the shooting in general terms.  They could not identify the assailants.  As we discuss in more detail below, the identities of the driver, shooter and his cohort were developed from statements made by Snell and Williams after being taken into custody.

Ashton Croswell, an associate of the Grape Street Crips, was shot in the buttocks. The bullet traveled upward, perforated his colon, exited his torso and re-entered his right arm. He died eight days later from blood loss caused by his wounds. The bullet was recovered from Croswell's arm. That bullet and another bullet recovered from the scene of the shooting were examined by a police ballistics expert who concluded that they were consistent with being fired from a nine-millimeter firearm.

After the shooting, Williams and Snell ran back to the car. Hawkins had the car running, waiting for their return, and the three assailants drove away from the scene.

During the course of the investigation of the shooting, police took Williams and Snell into custody, and placed them separately in a jails cell with a former gang member who was working undercover for the Los Angeles Police Department. The conversations were recorded. During the conversations, Williams and Snell each admitted Williams was the shooter, a "9" was used, Hawkins was the driver, Snell got out of the car with Williams, they were both wearing hoodies, and that both walked up to the targets where Williams started shooting. Snell told the informant that the police did not have any "pictures," and were "just guessing" about the shooting. Further, he stated that, "even if it was me," the police did not "go find the burner," and were "not going to find it," explaining: "We smashed that mother fucker. . . . We got that mother fucker wilted."

The People filed an information charging Williams, Hawkins and Snell as noted above. The charges against Hawkins and Snell were tried together to separate juries in November 2013, at which time the prosecution presented evidence establishing the facts summarized above. There was no direct eyewitness testimony or ballistics evidence connecting Snell to the murder; the evidence showing his involvement came primarily from the statements by Snell and Williams to the jailhouse informant. Snell's defense evidence consisted of a showing that he lived with his mother, and occasionally would visit his grandmother at her residence. His trial counsel argued that Snell's statements were vague, and did not truly show that he was a willing participant in the shooting. The trial court instructed the jury on first and second degree murder. Snell was convicted of murder, and the jury found the allegation that the murder was premeditated and

4

deliberate not true.[5]  The jury found the gang and principal use firearm allegations to be true.[6]

The trial court sentenced Snell to an aggregate term of 40 years to life as follows: an indeterminate term of 15 years to life for the murder, plus an indeterminate term of 25 years to life for the firearm enhancement imposed under section 12022.53, subdivision (d).  The court awarded Snell a total of 486 days of actual custody credit.

Snell filed a timely notice of appeal.

## DISCUSSION

### I.  Sufficiency of the Evidence

Snell contends his murder conviction must be reversed because the evidence was insufficient to support the jury's finding that he aided and abetted the murder.  He argues the evidence shows no more than that he accompanied his cohorts on a drive, and that it does not show that he asked or urged anyone to shoot.  Further, the evidence showed that he admitted he got scared and did nothing when Williams started shooting.  We disagree.  When examined in light of the usual standard of review, we find the evidence supports the jury's conclusion that Snell aided and abetted the murder.

When presented with a contention on appeal that a jury's verdict is not supported by substantial evidence, we follow well-settled standards of review.  We must examine the evidence in the light most favorable to the jury's decision, and presume in support of that decision the existence of every fact the jury could reasonably deduce from the evidence; further, we may not substitute our own conclusions for those reached by the jury, nor may we substitute our assessment of the credibility of a witness in place of the jury's credibility calls.  (See generally, *People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)  With regard to the predominant issue raised by Snell's sufficiency of the evidence claim,

---

[5]  We note that the abstract of judgment incorrectly indicates that Snell stands convicted of "murder – 1st degree."  We order that it be corrected and a copy sent to the Department of Corrections and Rehabilitation.

[6]  As noted above, Hawkins's jury convicted him of first degree murder, and found the gang benefit and principal use firearm allegations to be true.

namely, whether he intended to aid and abet in the shooting of the victim, the law recognizes that, because a defendant's intent is rarely admitted or otherwise shown by direct proof, a jury may infer intent from the circumstances surrounding the charged offense, and we must affirm a jury's intent determination when a reasonable inference drawn by the jury from the circumstances of the offense supports the jury's determination. (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

A person who aids and abets a crime has the same criminal liability as the actual perpetrator. (§ 31; *People v. Montoya* (1994) 7 Cal.4th 1027, 1038-1039.) A person aids and abets the commission of a crime when he or she has knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, facilitating or encouraging commission of the crime, " 'by act or advice aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

The evidence at trial, when viewed in the light favorable to the jury's verdicts, established that Snell was involved in an altercation with a "crab n ---," a member of the Grape Street Crips, on the day of November 6, 2012, and that he said at that time that he and his homeys were "going to get the n-----, but not right [then]." At 7:00 p.m. later that day, he, Hawkins and Williams drove into Grape Street Crips territory, where they first drove past and observed a group of gang members, then parked. After parking, Williams and Snell got out of the car together wearing hoodies, while Hawkins kept the car's engine running. Williams and Snell walked up the group they had just passed, and Williams started shooting. According to an eyewitness, Snell appeared to be "tugging" at his waistband. After the shooting, Snell and Williams ran back to the waiting car, and the three assailants fled the scene in the car. Williams and Snell destroyed the "burner" so it could not be found by police. Based on the totality of the evidence, the jury reasonably could have, and did, find that Snell intended to aid in the shooting, that he had an active role in going to the shooting and participating, at a minimum acting as a back- up to Williams, the actual shooter. The jury was not required to accept Snell's statements that he backed out of the shooting.

6

## II.    The Dying Declaration Issue

Snell contends his murder conviction must be reversed because the trial court erred in ruling that a statement made by victim Croswell at the scene of the shooting was not admissible under the dying declaration exception to the hearsay rule.  (See Evid. Code, §§ 1240, 1242.)  We disagree.

*Background*

Before Williams's case was severed, there was a pretrial discussion between the trial court and all of the parties' lawyers.  At the hearing, Williams' defense counsel represented to the court that eyewitness McCovery had provided information about certain events at the scene of the shooting, as follows.  After the shooting ended, McCovery went up to Croswell, who was on the ground, and asked, "Were you shot?"  Croswell answered, "I shot in my ass.  It feels like it's going in my stomach.  Damn.  Man.  It was the nigga Damion.  Bounty Hunters, man.  Man, I been -- I was into it with Damion, man, from Bounty Hunters.  That nigga said he was going to come get me, big homie, man."

Williams' counsel argued that victim Croswell's statements to McCovery should be admitted as a dying declaration.  Further, that the general substance of Croswell's dying declaration was supported by two other witnesses, Tyrone Lewis and Craig.  Specifically, counsel asserted that Lewis saw Damion Jackson shoot Croswell.  Lewis could not be reached, however, because he fled to New York after the shooting.  Counsel further represented that Craig would testify that the shooter was six feet tall, and argued that this was closer to Jackson's height than Williams' height, who is much shorter.  Counsel asserted that Jackson had taken credit for the shooting on his Facebook page, but then deleted the posting.  Further, that the community knew Jackson had taken credit for the shooting, that the detective testified at the preliminary hearing that Jackson insinuated he was the shooter, and that Jackson had also said that Williams was the shooter.  Jackson was initially arrested for the murder, but later released.  Williams admitted to the undercover former gang member that they had the wrong man in custody because he was, in fact, the shooter.

At a later pretrial hearing, after the charges against Williams had been severed, Snell's trial attorney advised the trial court that Snell "would like to join in all motions made by [Williams's counsel]," including the issue of "third-party liability wherein the victim indicates that somebody else did the shooting . . . ." Eventually, the court ruled that the statement was inadmissible. It explained that the statement was not a dying declaration "because there was no foundation for any firsthand knowledge [and] no foundation that [victim Croswell] was of the opinion that death was imminent."

*Analysis*

Snell argues the trial court erred in finding victim Croswell's statements were not a dying declaration and, thus, in excluding his statements that a third-party had shot him. We reject Snell's arguments because we cannot say that the trial court's ruling amounted to an abuse of discretion.

Hearsay evidence — evidence of an out-of-court statement offered to prove the truth of the matter stated — is inadmissible unless an exception applies. (Evid. Code, § 1200.) Under the dying declaration exception to the hearsay rule, a person's out-of-court statement "respecting the cause and circumstances of his death" is admissible "if the statement was made upon his personal knowledge and under a sense of immediately impending death." (Evid. Code, § 1242.) "'To be admissible in evidence as dying declarations, the statements of the decedent must have been made at a time when he had abandoned all hope of life so that he believed that death inevitably must follow. This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind.'" (*People v. Tahl* (1967) 65 Cal.2d 719, 725 (*Tahl*).) It is not required that the declarant "expressed in words the belief that he was about to die." (*People v. Vukojevich* (1914) 25 Cal.App. 459, 462.) Rather, a statement is admissible as a dying declaration where the evidence shows that it was made under the knowing "sanction" of immediately impending death, "'whether it be directly proved by the express language of the

8

declarant, or be inferred from his evident danger, . . . or from his conduct, or other circumstances . . . ,' " all of which may be considered in " 'ascertain[ing] the state of the declarant's mind.' " (*Id*. at pp. 462-463.)

A trial court's ruling on the admissibility of a statement as a dying declaration is subject to review under the abuse of discretion standard. (*People v. Monterroso* (2004) 34 Cal.4th 743, 763 (*Monterroso*); *People v. Mayo* (2006) 140 Cal.App.4th 535, 553 (*Mayo*).) Under this standard, a trial court's evidentiary ruling cannot be disturbed on appeal unless it is shown that the court exercised its discretion in an arbitrary, capricious or absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Here, the trial court did not abuse its discretion in excluding Croswell's statement, finding that he did not make his statements "at a time when he had abandoned all hope of life so that he believed that death inevitably must follow." (*Tahl, supra*, 65 Cal.2d at p. 725.) Croswell plainly knew that he had been shot in his derriere and that it felt like the bullet had travelled into his "stomach," but the surrounding circumstances did not show that he was of the mental state that his wound was likely to be immediately fatal. He did not say anything or act in a manner which suggested that he thought he was dying. McCovery's advice to Croswell not to try to speak "because you're bleeding real bad" came after Croswell had already made his statements, and thus cannot be a basis for imparting a belief that Croswell was going to die. Further, the trial court reasonably could have found that McCovery's statement was an expression of his concern for Croswell's welfare, not a prompt for Croswell to believe that he was in an immediate danger of death.

Snell's reliance on the coroner's testimony is also not persuasive. The coroner's expert opinion explained what caused Croswell to die eight days after being shot, but we do not know from this information that Croswell necessarily understood at the scene of the shooting that he had been fatally wounded so that death was immediately upon him. Since a dying victim must himself have had a personal sense of his immediately pending

9

death, the coroner's opinion made after the victim died does not establish that Croswell believed his death was impending.

In *Mayo, supra*, 140 Cal.App.4th 535, a declarant was in the living room of another man's apartment when he was shot by an assailant. He "screamed to [the man who was then in the kitchen and did not directly witness the shooting], 'Why did you let "Q" [the defendant's nickname] blast me?' " (*Id*. at pp. 540, 553.) The trial court admitted the declarant's statement as a dying declaration to prove that the defendant was the shooter. Division Seven of our court affirmed the ruling, rejecting the defendant's arguments that the declarant "never gave any indication he thought he was dying and made no pleas that his life be saved." The court found the evidence supported the trial court's conclusion that the declarant had thought he was dying because he "was shot multiple times from close range, suffering 11 gunshot wounds to his back, arms, legs, and hips . . . ." (*Id*. at p. 553.) Further, the declarant had said that he "felt really hot and wanted a fan to cool himself down . . . [and] sensed the gravity of his condition, asking [the man] whether he had been shot in the head." (*Id*. at p. 554.)

The types of gunshot wounds supporting admissibility of the statements in *Mayo* as a dying declaration are not of the extent and kind suffered by Croswell in Snell's current case. Here, Croswell suffered a single gunshot wound and, while knowing that he had been shot, did not make the type of further statements as did the victim in *Mayo*.

In *Monterroso, supra,* 34 Cal.4th 743, the Supreme Court affirmed a trial court's ruling admitting a robbery and shooting victim's statements as a dying declaration to prove the prosecution's case against the defendant under the following factual showing: "[T]he prosecution established the objective severity of [the declarant]'s fatal wounds as well as his subjective awareness of those wounds. . . . In this case, the prosecutor relied on the declarant's statements, demeanor, and conduct, as well as his evident injuries. The gunshot pierced [the declarant's] respiratory system, his gastrointestinal system, and his liver. The chest wound and the liver damage were each 'of a great magnitude and dangerous in itself.' These wounds were the cause of death, which occurred 11 days later. Further, Officer Cheryl Murphy testified that at the time the statements were made,

10

[the declarant] knew he had been shot, was in great pain and on the ground in a fetal position, was fearful of dying, and never spoke again." (*Monterroso, supra*, 34 Cal.4th at p. 763.)

We reiterate that here, Croswell suffered a single gunshot wound. While he knew he had been shot, he did not make the type of further statements as did the victim in *Mayo*. The facts in this case did not establish that Croswell "was fearful of dying," (*Monterroso, supra*, 34 Cal.4th at p. 763), but only that he had been seriously wounded Under the abuse of discretion standard of review, we cannot say the trial court erred by excluding Croswell's statements in Snell's current case.

Lastly, Snell contends the exclusion of Croswell's statements constituted an error of constitutional magnitude because it violated his due process right to present a defense, namely a defense of third-party culpability. We are not persuaded. First, as Snell concedes in his opening brief, his trial counsel did not object to the exclusion of Croswell's statements on the ground it would violate his constitutional right to present a defense. This said, we agree with Snell that we may examine whether his trial ultimately was fundamentally unfair as a result of the trial court's ruling. (*People v. Partida* (2005) 37 Cal.4th 428, 436-438.) We do not find a due process violation in Snell's trial because a third-party culpability defense based on Croswell's statements would not have been particularly beneficial to Snell. Croswell's statements, at best, may have tended to undercut Williams's identity as the actual shooter. There was nothing in Croswell's statements tending to have any effect on Snell's identity as the second assailant who drove to the scene, walked up to the targets with the shooter, and then fled with the shooter.

Finally, we would find any error in the exclusion of Croswell's statements harmless error under both the state evidentiary standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, and *Chapman v. California* (1967) 386 U.S. 18, 24, for the reasons discussed in the immediately preceding paragraph. The most that could have been gained from the proffered third party culpability evidence through Croswell's dying declaration would have been confusion as to the identity of the actual shooter. It would not have had

11

any effect on Snell's identity as the second assailant at the scene, who walked up to the targets with the shooter, and fled with the shooter.

### III.    The Admissibility of Snell's Own Statements

Snell contends his murder conviction must be reversed because the trial court erred in admitting his statements to the undercover former gang member informant in the jail cell.  We disagree.

Snell argues that his statements to the police informant were "testimonial" in nature and, as such, should have been excluded under Confrontation Clause principles as explained in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Apparently, Snell is arguing that his own inculpatory statements should not have been admitted because he could not confront or cross-examine himself.  The respondent's brief submitted by the People argues *Crawford* in kind.

As a preliminary matter, we express reservation with an issue not openly recognized in the parties' briefs, namely, whether Confrontation Clause principles have any applicability to the issue of the admissibility of a defendant's own statements against his interest.  The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  When a defendant's own statements are admitted against him at trial, the defendant is free to testify and rebut the hearsay statements made against him or her, thus obviating any Confrontation Clause problem.  Further, in the published cases dealing with the use of a *co-defendant's* statements implicating a different defendant (see, e.g., *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*)), the courts seem to accept implicitly that the co-defendant's statements would be admissible against the co-defendant himself or herself without violating the Confrontation Clause.

But even assuming that Confrontation Clause principles and *Crawford* apply to the use of Snell's statements against his own interest, we find no error.  In *Crawford*, the Supreme Court ruled that the Confrontation Clause protects a defendant against the use of evidence that is "testimonial" in nature.  (*Crawford, supra*, 541 U.S. at p. 51.)  If the

12

evidence is not testimonial, it is not subject to the Confrontation Clause. (*People v. Cage* (2007) 40 Cal.4th 965, 981, fn. 10.) Evidence of a testimonial nature includes formal testimony, and statements which resemble testimony, such as responses to express police interrogation undertaken to develop evidence to be used at trial. (*Crawford, supra*, 541 U.S. at pp. 51-52; *Davis v. Washington* (2006) 547 U.S. 813, 830 (*Davis*).) Thus, remarks made to friends or "off-hand" are not testimonial. (*Crawford, supra*, 541 U.S. at p. 51.)

For reasons in agreement with those expressed in *People v. Arauz* (2012) 210 Cal.App.4th 1394 (*Arauz*), we find Snell's statements to the police informant were not testimonial, and not made inadmissible by *Crawford*. As explained in *Arauz*, an out-of-court statement can be divided after *Crawford* into one of two broad categories: responses to police-like interrogations, which are viewed as "testimonial" hearsay, or, alternatively, statements in which no interrogation takes place, which are viewed as "nontestimonial" hearsay. The use of nontestimonial hearsay "is subject only to 'traditional limitations upon hearsay evidence,' and does not implicate the Sixth Amendment right of confrontation. (*Arauz, supra*, 210 Cal.App.4th at pp. 1401-1402, quoting *Davis, supra*, 547 U.S. at p. 821.) *Arauz* further noted that, in *Davis, supra*, the United States Supreme Court "gave examples of nontestimonial statements: 'statements made unwittingly to a Government informant' and 'statements from one prisoner to another.'" (*Arauz, supra*, 210 Cal.App.4th at p. 1402, quoting *Davis, supra*, 547 U.S. at p. 825.)

*Arauz* then went on, and examined the nature of the declarant's statements at issue there: "Velasquez thought he was answering to the Mexican Mafia. He had no belief that his statements were being monitored and would be used in a subsequent trial. [Citation.] Federal courts have repeatedly held that statements unwittingly made to an informant are not 'testimonial' for confrontation clause purposes. [Citations.] We agree with the rule and rationale of these cases. We hold that statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause. The

last thing Velasquez expected was for his statement to be repeated in court. [Citation.]" (*Arauz, supra*, 210 Cal.App.4th at p. 1402.)

Our view of Snell's statements is the same. He believed he was talking to an older, more experienced, fellow gang member. The last thing Snell expected was for his statements to be used against him in court.

Snell proffers two responses to the conclusions rendered above. First, he argues that *Arauz* was wrongly decided. We do not agree. We find *Arauz* correctly followed the guidance of *Davis, supra*, 547 U.S. 813, and, thus, find it may properly be applied in examining Snell's current case. Statements to a jailhouse informant are not subject to Confrontation Clause principles and *Crawford* because such statements are nontestimonial.

Second, Snell contends there is a nuanced fact which takes his case out of the ambit of *Arauz* and other cases involving informants —— that his statements to the jail informant were recorded. According to Snell: "It is appellant's contention that, because the statements [he] made were *recorded* by a police agency, and police [deliberatively] put an informant into appellant's jail cell in order to elicit evidence to be used at trial, the recorded statements are testimonial. Since [recorded statements obtained by] hidden recording devices, like documented affidavits [prepared for use in court], were prepared for the express purpose of getting a conviction at trial, statements recorded on these devices are 'testimonial' under *Crawford*." (Italics in original.) Snell cites *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310 (*Melendez-Diaz*) in support of his argument. We reject Snell's argument.

In *Melendez-Diaz*, a drug case, the United States Supreme Court ruled that lab results recorded on "certificates of analysis" document showing that seized contraband was, in fact, cocaine, constituted "testimonial" hearsay under *Crawford* because, "quite plainly," the "sole purpose" of the certificates was to prove the composition, quality and net weight of the analyzed substance, which was used in proving guilt. (*Melendez-Diaz, supra*, 557 U.S. at p. 310.) Snell likens his "recorded" statements to the certificates at issue in *Melendez-Diaz*. We do not see the analogous connection.

14

The certificates at issue in *Melendez-Diaz* were "quite plainly" prepared to be used against a defendant at trial. Snell's statements to a jail cellmate informant, whether or not they were recorded, were not understood by him to be open to being used against him at a trial. The "recorded" aspect of Snell's jailhouse statements strikes us as an irrelevant to the *Crawford* analysis. The critical factor in the *Crawford* analysis is whether the person making the statements at issue, in *Melendez-Diaz,* the lab tech, and in Snell's case, Snell, made "testimonial" statements. In the lab tech context, the lab tech was stating, in effect, "Here is scientific evidence showing why you should convict the defendant." In Snell's case, Snell was having a conversation with a jail mate. The former scenario is an example of a testimonial statement; the latter is not.

## IV.    Admissibility of Cohort Williams' Statements Under *Crawford*

Snell contends his murder conviction must be reversed because the trial court erred in ruling that statements made by the shooter, Williams, to the undercover former gang member in a jail cell were admissible. Again, Snell argues *Crawford*. We find no error.

As noted above, the Supreme Court ruled in *Crawford* that the Confrontation Clause protects a defendant against the use of evidence that is "testimonial" in nature. (*Crawford, supra*, 541 U.S. at p. 51.) Here, we again find *Arauz, supra*, 210 Cal.App.4th 1394 applicable. When Williams was speaking to the informant, he (Williams) did not have any reason to believe that the statements he was making were being collected to be used as evidence in any criminal prosecution. Williams believed he was conversing with a fellow gang member.

## V.    Admissibility of Cohort Williams' Statements Under *Aranda/Bruton*

Snell next contends his murder conviction must be reversed because the trial court erred in ruling that statements made by the shooter, Williams, to the undercover former gang member in a jail cell were admitted into evidence. Here, Snell argues it was error under *Aranda, supra,* 63 Cal.2d 518 and *Bruton, supra,* 391 U.S. 123 (hereafter the *Aranda/Bruton* rule) to admit the parts of Williams's statements that implicated Snell in the shooting. He argues the parts of Williams's statements that implicated Snell in the

shooting should have been redacted in accord with *Richardson v. Marsh* (1987) 481 U.S. 200 and *Gray v. Maryland* (1998) 523 U.S. 185.  We disagree.

Williams' statement was redacted in many respects, as evidenced by the blacked out portions of the transcript which was presented to the jury.  Snell contends the trial court's redaction were insufficient because Williams' statement included a reference to the fact that he was with "other guys" at the shooting and that "it was the three of us," whom he referred to as "Barnell" and "DJ."  Snell contends "Cordell Hawkins and Darnell Snell were the two people on trial in this case and appellant's first name starts with a "D."  Thus, it does not take additional evidence to conclude that Williams' statement referenced appellant as "DJ."

The *Aranda/Bruton* rule bars admission at a joint trial of one defendant's out-of-court confession that powerfully and facially incriminates a co-defendant, even when the court instructs the jury to consider the confession only against the confessing defendant. (See *Bruton, supra*, 391 U.S. at pp. 135-136; *Aranda, supra*, 63 Cal.2d at pp. 529-530.) The rule is based on the concern that jurors may be unable to obey the limiting instruction when both defendants are in the courtroom, being tried for the same crime.  In short, the rule is intended to avoid the potential unfairness that the jury will improperly consider the hearsay confession against the non-confessing co-defendant.  (*Bruton, supra*, 391 U.S. at pp. 135-136.)  The *Aranda/Bruton* rule is rooted in a defendant's Sixth Amendment right of confrontation, which is unavailable to the defendant at a joint trial when his or her co-defendant does not testify.

Snell's *Aranda/Bruton* argument fails because, in his case, there is no issue with a co-defendant's confession to police.  Williams's statements were not made to police in a confession which he understood might be used against him at trial.  Here, our discussion folds back on our *Crawford* discussion above.  Because Williams's statements were not testimonial in nature, their use simply did not implicate Snell's Sixth Amendment right of confrontation and thus did not fall under the ambit of the *Aranda/Bruton* rule.

## VI.     The Juvenile Sentencing Issue

In a supplemental opening brief on appeal, Snell contends that his 40-years-to-life sentence is tantamount to a sentence of life without the possibility of parole (LWOP), and that, as such, it violates the juvenile sentencing principles embodied in *Graham, supra,* 560 U.S. 48, *Miller, supra*, 132 S.Ct. 2455, and its progeny, including *Gutierrez*, *supra*, 58 Cal.4th 1354 and *Caballero, supra*, 55 Cal.4th 262.[7]  We find no error.

### *The Governing Sentencing Principles*

In *Graham,* the United States Supreme Court held that sentencing a juvenile to life without the possibility of parole for a nonhomicide offense violates the Eighth Amendment's prohibition of cruel and unusual punishment.  (*Graham*, *supra*, 560 U.S. at p. 82.)  Central to this result was the Court's appreciation for the "fundamental differences between juvenile and adult minds" and its recognition that juveniles are "more capable of change than are adults . . . ."  (*Id*. at p. 68.)  The court subsequently extended the reasoning of *Graham* to hold imposition of a mandatory sentence of life without parole on a juvenile convicted of murder also violates the Eighth Amendment.  (*Miller v. Alabama, supra,* 567 U.S. ___ ; 132 S.Ct. 2455].)  As the court explained, such penalties "preclude[] consideration of [an offender's] chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences."  (*Id*. at p. 2468.)  In essence, the court concluded that *Graham's* directive to consider the unique characteristics and vulnerabilities of juveniles is not crime-specific and that its reasoning implicates any life-without-parole sentence for a juvenile.  (*Id*. at p. 2458 [opinion summary].)  Article I, section 17 of the California Constitution contains a similar prohibition of punishment "not only if it is inflicted by a cruel and unusual method, but also if it is grossly disproportionate to the offense for which it is imposed."  (*People v. Dillon* (1983) 34 Cal.3d 441, 478, fn. omitted.)

---

[7]     Snell was born on January 25, 1995, making him 17 years and 9 months old on the date of the murder.

In *Gutierrez, supra,* 58 Cal.4th 1354, our state Supreme Court harmonized section 190.5, subdivision (b), with Eighth Amendment protections as clarified by *Miller*. Under section 190.5, subdivision (b), our state's sentencing courts have discretion to sentence a youthful offender to serve 25 years to life or LWOP, with no presumption in favor of the LWOP option. (*Gutierrez, supra*, 58 Cal.4th at pp. 1371-1379.) Because the defendants in *Gutierrez* had been sentenced under a prior sentencing scheme with a presumption in favor of LWOP sentences for special circumstance murder, the Supreme Court held that resentencing was required. (*Ibid*.) Further, the Supreme Court rejected the government's argument that the then-recent enactment of section 1170, subdivision (d)(2), providing a procedural mechanism for a juvenile offender to petition to recall a sentence, removed the sentencing issue from the concerns expressed in *Miller*. (*Id*. at p. 1386.) As the Supreme Court explained in *Gutierrez*, *Miller* controls and requires a sentencing court to consider the special characteristics of a juvenile offender before imposing a LWOP sentence. (*Id*. at pp. 1386-1387.)

In *Caballero, supra,* 55 Cal.4th at page 268, the California Supreme Court held a 110-year-to-life sentence imposed on a juvenile convicted of nonhomicide offenses (three gang-related attempted murders) was the functional equivalent of a life sentence without the possibility of parole and was invalid in light of the decisions in *Graham* and *Miller*. (*Cabellero*, at pp. 268-269.) The court rejected the argument that a cumulative sentence for distinct crimes does not present an Eighth Amendment issue and found, when a juvenile is sentenced to minimum terms that exceed his or her life expectancy, the punishment is excessive under *Graham* and *Miller*. (*Caballero*, at pp. 268-269.) As the court noted, "the state may not deprive [juveniles] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Id*. at p. 268.) A sentencing court must consider mitigating circumstances before determining at which point juveniles can seek parole, including their age, whether they were a direct perpetrator or an aider and abettor, and their physical and mental development. (*Ibid*.)

18

In response to the developing juvenile sentencing rules articulated in *Miller*, *Graham*, *Gutierrez*, *Caballero* and similar cases, the Legislature enacted section 3051 to establish procedures for a "youth offender parole hearing" for juvenile offenders who are sentenced to a life term. The issue of whether post-sentence parole eligibility procedures sufficiently assuage the juvenile sentencing concerns discussed in *Miller* and the related cases is a subject of conflicting decisions in our state's courts of appeal, and several cases are pending in the Supreme Court. (See, e.g., *In re Alatriste* (2013) 220 Cal.App.4th 1232 (rev. granted Feb. 19, 2014, S214652); *People v. Martin* (2013) 222 Cal.App.4th 98 (rev. granted Mar. 6, 2014, S216139; *People v. Franklin* (2014) 224 Cal.App.4th 296 (rev. granted June 11, 2014, S217699.) This said, we do not need to decide whether the availability of any particular post-sentence parole eligibility procedures is sufficient to assuage the juvenile sentencing concerns discussed in *Miller* and the related cases. We find this to be true because Snell's sentence of 40 years to life is not, with or without consideration of any special parole eligibility procedures for juvenile offenders, the "functional equivalent" of an LWOP sentence within the meaning of *Cabellero*.

A number of cases since *Cabellero* have addressed whether a sentence of a given length is the "functional equivalent of an LWOP sentence." Some cases have ruled that, regardless of the length of a sentence, following *Cabellero*, the availability of juvenile offender parole eligibility procedures under new hearings now overcomes the "functional equivalent" of an LWOP issue discussed in *Cabellero* for purposes of the applicability of *Miller*. Other cases have declined to find that the availability of special procedures for parole for juvenile offender is enough to avoid examination of the factors discussed in *Miller* — in the first instance — at the time of sentencing. In these cases, the courts of appeal have looked at the length of a sentence and then made a measured determination whether it amounted to the functional equivalent of an LWOP sentence because a defendant would have no realistic possibility of ever seeking parole. It appears that all of these juvenile sentencing cases, from whatever perspective, have been granted review in the Supreme Court.

19

*The Sentencing Proceedings*

The prosecution filed a sentencing memorandum computing Snell's sentence to be 40 years to life as follows: an indeterminate term of 15 years to life for the murder, plus an indeterminate term of 25 years to life for the firearm enhancement. The prosecution acknowledged that Snell was a juvenile offender, but argued that the prescribed term would not violate *Graham* or *Miller* or *Caballero*. In making this argument, the prosecution noted that Snell would be "entitled to submit a petition" to recall his sentence pursuant to section 1170, subdivision (d)(2), after he had served "at least 15 years in prison," and that he would have subsequent opportunities "at the 20, 24, and 25 year marks." Snell filed a sentencing memorandum arguing that his sentence of 40 years to life "amounted to LWOP," and that such a sentence would violate the Eighth Amendment.

In response to Snell's sentencing memorandum, the prosecution submitted a series of actuarial tables showing that Snell's life expectancy was 69-70 years of age. Based on this foundation, the prosecution proposed that Snell would be 57 years of age when he became eligible for parole, meaning that he would not effectively be sentenced to an LWOP term if sentenced to 40 years to life. Further, the prosecution cited to section 3501, which provides for a youth offender early parole hearing. Snell filed a reply, arguing that section 1170, subdivision (d)(2), "does not render a de facto juvenile life sentence constitutional."

At the time of sentencing, the trial court expressly recognized that Snell was a juvenile offender, Beyond this, the court stated that it found Snell "irreparably corrupt," and that "a sentence of 40 years to life in this case is not a de facto life sentence," making a reference to the juvenile offender early parole hearing laws. The court imposed a sentence of 40 years to life without making any further balancing of reasons for imposing a term of 40 years to life.

*Analysis*

Here, we find the length of Snell's sentence does not measure out to be the functional equivalent of an LWOP sentence. Even without looking at the new juvenile

20

offender parole eligibility statutes, long-enacted and generally applicable parole provisions would allow Snell's sentence of 40 years to life to be reduced by credits for work time served, and he would be able to seek parole while still in his 50's. (See, e.g., § 2933.2 [a person who is convicted of a murder accrues no conduct credit; only actual time credit].) The life expectancy tables offered by the prosecution in the trial court, to which we see no objection by Snell, showed that his life expectancy was longer than his 50's. Snell's 40-years-to-life sentence is not measurably similar to the defendant's sentence in *Cabellero*. There, the defendant was sentenced to 110 years to life, and it would have been virtually impossible for him to become eligible for parole within his natural life expectancy. Here, Snell will be eligible in his expected natural life. The trial court's express finding that Snell's sentence was not the equivalent of an LWOP sentence, although premised on the newer statutes governing juvenile offender parole procedures, is supported by the record.

Because Snell was not sentenced to the functional equivalent of an LWOP sentence as defined in *Cabellero*, the sentencing concerns expressed in *Miller* are not implicated, and the trial court was not required to undertake the balancing examination of factors that *Miller* contemplates. Snell's sentence of 40 years to life comports with the sentencing law and is not constitutionally infirm under *Miller*.

**DISPOSITION**

The abstract of judgment is ordered corrected to identify the murder conviction as second, not first, degree murder. In all other respects, the judgment is affirmed.


BIGELOW, P.J.

We concur:



RUBIN, J.             GRIMES, J.


21
